## YOCHIM BROTHERS CO., LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4559.   Promulgated April 22, 1927.

1. The evidence fails to show that the good will, formulas, trademarks, and trade brands paid in to the petitioner for shares of capital stock on September 1, 1911, had any fair market value on March 1, 1913.

2. The amount included in invested capital for intangible property paid in for stock before March 3, 1917, should not have exceeded 25 per cent of the par value of the stock outstanding on that date.

*W. E. Hayes, Esq.*, for the petitioner.
*M. N. Fisher, Esq.*, for the respondent.

This is a proceeding for the redetermination of deficiencies in income and profits tax for the years 1918 and 1919 in the amounts of $22,476.90 and $698.97, respectively. In its income-tax return for each of these years the petitioner deducted from gross income $41,815.24 as property loss arising from obsolescence of good will, formulas, trade-marks, and trade brands. The question in issue is the right of the petitioner to make such deductions. In his answer the respondent alleges error in the computation of invested capital for the year 1919.

FINDINGS OF FACT.

Joseph C. Yochim and his brother, A. R. Yochim, of New Orleans, La., in the year 1898 organized a partnership known as Yochim Brothers, and engaged in the business of rectifiers and compounders of cordials and bitters. The basic ingredients of these cordials and bitters were alcoholic spirits. The partnership was the predecessor of Yochim Brothers Co., Ltd., the petitioner, which was incorporated on September 1, 1911. The partnership began business with borrowed capital of $500. It originated and owned certain secret formulas from which it manufactured cordials, bitters, and other alcoholic drinks and endeavored to compete in the local market with certain cordials imported from France. It built up an established business and sold its products to liquor dealers in New Orleans and after a few years a demand developed for its products in many places outside of New Orleans in the States of Louisiana, Texas, and Mississippi. In New Orleans its clientele included such well known places as the Hotel Grunewald, Monteleon, St. Charles Hotel, H. T. Remus, Conrad Kolb, Arnold's Restaurant, and Absinthe House. The cordials and bitters manufactured were special concoctions originated and manufactured by the Yochim Brothers partnership, and contained special ingredients and differed from other blends and brands by reason of the flavor of the concoctions resultant from the particular ingredients and blends known only to Yochim Brothers. The rectifying work was at all times done by one of the partners, Joseph C. Yochim, and all blending of the secret formulas was done by him.

Although the partnership started with a borrowed capital of $500 it did not owe a dollar to any one at the end of 18 months and at the end of 3 years was discounting all bills and buying in considerable quantities. Out of the earnings of the partnership and before incorporation in 1911, the two brothers purchased a number of parcels of real estate and made other investments, some of which were not profitable.

In addition to the secret formulas, the partnership owned trade brands, trade names, and trade-marks, and these, together with the secret formulas and good will, were transferred on September 1, 1911, to the corporation. The three trade-marks owned by the partnership were secured from the United States Government, one in 1900, one in March, 1903, and another about the same time for aromatic bitters. All of the products of the partnership manufactured under its formulas were marketed under special labels. The sales increased from year to year.

As of September 1, 1911, the petitioner corporation, which had an authorized capital stock of $125,000, issued stock at par value to the amount of $105,000 for the assets of the partnership turned over to it.

The three stockholders at September 1, 1911, and the shareholdings of each were as follows:

|  | Shares |
|---|---|
| J. C. Yochim | 400 |
| A. R. Yochim | 400 |
| C. E. Jones | 250 |

Jones was taken into the corporation for the purpose of operating a soft-drink department. It was expected that he would obtain for the corporation agencies for certain liquors. The 250 shares of stock issued to him were held in escrow by Yochim Brothers to be turned over to Jones when he should have accomplished certain results. When he failed to fulfill the terms of the escrow agreement these shares of stock were issued to the two Yochim brothers.

The assets and liabilities of the corporation immediately after organization were as follows:

| Assets: | | Liabilities: | |
|---|---|---|---|
| Tangibles | $35, 784. 05 | Accounts and bills payable | $14, 752. 31 |
| Intangibles | 83, 968. 26 | Capital stock | 105, 000. 00 |
| Total | 119, 752. 31 | Total | 119, 752. 31 |

The principal tangibles were set up on the books of account as—

| | |
|---|---|
| Merchandise inventories | $18, 706. 43 |
| Stamp machines' inventories | 1, 187. 61 |
| Merchandise on consignment | 644. 43 |
| Customers' accounts | 11, 675. 75 |

The intangibles were set up on the journal as follows:

FORMULA AND TRADE MARKS

| | |
|---|---|
| Standard American Aromatic Bitters | $15, 000. 00 |
| Yochim Bros. Celebrated Stomach Bitters | 15, 000. 00 |
| Yochim Bros. Aromatic Bitters | 10, 000. 00 |
| Yochim Bros. Absinthe | 5, 000. 00 |
| Yochim Bros. Kummel Cordial | 2, 500. 00 |
| "    "    Creme de Menthe | 2, 500. 00 |
| "    "    "    " Rose | 1, 000. 00 |
| "    "    "    " Nayoux | 1, 000. 00 |
| "    "    "    " Coco | 1, 000. 00 |
| "    "    "    " Vanilla | 1, 000. 00 |
| "    "    "    " Pous Cafe | 1, 000. 00 |
| "    "    Blackberry Brandy | 1, 000. 00 |
| "    "    Apricot Brandy | 2, 000. 00 |
| "    "    Prunello | 1, 000. 00 |
| "    "    Anisette | 1, 000. 00 |
| "    "    Ojen Cordial | 5, 000. 00 |
| "    "    Standard Dry Gin | 500. 00 |
| "    "    Dry Gin | 500. 00 |
| "    "    Holland Gin | 500. 00 |
| "    "    Sloe Gin | 500. 00 |
| "    "    Key Gin | 500. 00 |
| Good Will | 9, 130. 48 |
| Total paid at organization | 83, 630. 48 |

The principal liabilities were:

| | |
|---|---|
| Bills payable | $2,000.00 |
| Purchase accounts | 11,517.90 |

During the years 1911, 1912, and 1914, 45 shares of treasury stock were sold to 12 different individuals at par, making the outstanding capital stock after May 19, 1914, $109,500.

From September 1, 1911, to some time in 1912, C. E. Jones was vice president of the corporation and had authority to purchase materials necessary for the manufacture of soft drinks. He purchased merchandise in excess of the immediate requirements of the business. The result was disastrous. An audit of the petitioner's books of account for the fourteen-month period ended October 31, 1912, showed sales of $96,609.16 and a net loss from operations of $20,651.21. A certified public accountant who made an audit of the petitioner's books for the period in question reported to the petitioner under date of December 6, 1912, in part as follows:

When it was shown that the business was going behind, instead of making a careful study of your condition and the causes leading thereto, expenses were allowed to remain the same and your officers resorted to check and note kiting and other questionable financial methods to raise the necessary funds to keep the ship afloat.

Jones was ousted from the corporation in 1913. The petitioner immediately began to dispose of the goods which had been purchased for the soft-drink department. An audit of the petitioner's books for the fourteen-month period ended December 31, 1913, showed sales of $69,287.08 and a net profit for the period of $318.08. In his report of February 18, 1914, the same certified public accountant reported:

While your statement shows only a small profit on operations for the past 14 months, still when account is taken of the large amount of dead stock which had to be disposed of at a loss, and the bad debts charged off, as well as the poor credit standing of the company fourteen months ago, it is a splendid showing to say that the company has been able to more than hold its own during this period and should mean good return upon your investment under normal conditions.

The sales and net profits of the business for the years 1914 to 1919, inclusive, as shown by the audit reports were as follows:

| Year | Net sales. | Net profit. |
|---|---|---|
| 1914 | $98,274.02 | $23,290.96 |
| 1915 | 71,213.75 | (Not stated.) |
| 1916 | 92,771.14 | 4,963.64 |
| 1917 | 109,563.88 | 5,628.82 |
| 1918 | 158,466.71 | 38,766.14 |
| 1919 | 234,753.04 | 10,678.84 |

The net profits shown for the years 1918 and 1919 are before the deduction of any amount for obsolescence or loss of intangibles rendered worthless by prohibition legislation.

In 1912 or 1913 one R. L. Viguerie, a wholesale and retail liquor dealer in New Orleans, who purchased from the petitioner certain products and conducted a large mail-order business and had annual sales of approximately $250,000, desired to become associated with the petitioner and offered to purchase $30,000 of its capital stock at par, provided the petitioner would take in part payment Viguerie's stock of liquors at the invoice price estimated at from $22,000 to $25,000. He agreed to pay cash for the balance. This was at a time when the business of the petitioner was at its lowest ebb owing to the operation of the soft-drink department and at a time when its credit was poor. The offer was not accepted by the Yochims since they were afraid Viguerie might have a considerable amount of immovable stock. This offer was made by Viguerie after he had spent between $10,000 and $12,000 in an unsuccessful venture to duplicate the cordials and bitters made by Yochim Brothers.

In computing invested capital for the year 1918 the Commissioner included intangibles to an amount equal to only 25 per cent of the par value of the capital stock outstanding ($109,500). In computing invested capital for 1919 he failed to make any reduction of invested capital by reason of the limitation imposed by the law upon the inclusion in invested capital of intangibles paid in for shares of capital stock.

The petitioner sold all of its tangible assets and dissolved during the year 1919. Its intangibles were not sold. In closing its books of account for the year 1918 it charged off as a loss $83,630.48, its book value of formulas, trade-marks, trade brands, and good will. One-half of this amount was claimed as a deduction from gross income in its income-tax return for 1918 and the balance from gross income in its income-tax return for 1919. The Commissioner disallowed these deductions and increased net income accordingly. The deficiencies herein complained of result from such disallowances.

Many of the records of the petitioner were destroyed in 1919 or 1920. Duplicate records filed with the collector of internal revenue have also been destroyed.

OPINION.

SMITH: The questions presented by this proceeding are (1) the cost and actual cash value of certain intangibles consisting of good will, formulas, trade-marks, and trade brands paid in to the petitioner corporation at organization on September 1, 1911, for $83,968.26 par value of its capital stock, and the value of such intan-

gibles at March 1, 1913; (2) whether the petitioner is entitled to deduct from gross income of 1918 any amount representing the loss through obsolescence or otherwise of such intangibles; (3) whether the petitioner is entitled to deduct from gross income of 1919 any amount in respect of the loss of the value of such intangibles in 1919; and (4) if it is entitled to any such deduction for 1919, whether the deduction may be made for the purpose of computing a " net loss " under section 204 of the Revenue Act of 1918.

The most important question for consideration is the fair market price or value on March 1, 1913, of the intangibles paid in for shares of stock in 1911. If they had no such value on that date the petitioner is not entitled to deduct any amount from gross income of the years 1918 and 1919 in respect of them. The predecessor partnership apparently operated at a considerable profit. Although the two Yochim brothers started in business on borrowed capital, in the course of a few years they had paid off their debts and had accumulated some property. At the date of incorporation the tangibles had a clear value in excess of $20,000. The corporation operated either at a net loss or with a negligible profit for the first five or six years of its existence. It did not even earn a fair return upon its tangibles. The evidence would indicate that this showing is due in large part to an unfortunate venture which the corporation entered into in the manufacture and sale of soft drinks. We can not, however, determine from the evidence the amount of the loss attributable to the soft-drink business. The auditor's report for the year 1913 indicates that most of the stock purchased for the manufacture of soft drinks had been disposed of prior to the close of 1913. The corporation operated at some profit for the year 1914; sales for the year 1915 were much less than those for 1914, and it is not in evidence whether there was a net profit for that year; the net profits for the years 1916 and 1917 were small.

At the hearing it was attempted to prove the value of the intangibles at March 1, 1913, by an offer made by one Viguerie to purchase $30,000 of the petitioner's capital stock at par. This offer was not accepted because Viguerie was to turn in a stock of liquors owned by him at the invoice price of from $22,000 to $25,000 and the Yochim Brothers had some doubt as to the salability of this stock at the invoice price. The only other important evidence of value of the intangibles at the basic date is the sale of a few shares of stock at par during the years 1911, 1912, and 1914. We think, however, that the sale of these few shares of stock furnishes little evidence of the value of the intangibles of the petitioner in 1913. It appears to us that the earnings afford the most satisfactory evidence of value and those earnings indicate that the intangibles had little more than a

nominal value. In the absence of evidence showing a fair market price or value for the intangibles on March 1, 1913, the determination of the respondent that they had no value on the basic date and that the petitioner sustained no loss when the worthlessness of them was made apparent by national prohibition in 1918 or 1919, must be sustained.

In view of this conclusion, it is not necessary to consider the other allegations of error made by the petitioner.

In his answer to the petition the respondent alleged error in computing the invested capital for the year 1919. This was computed without applying the 25 per cent limitation to intangibles provided for by section 326 (a) (4) of the Revenue Act of 1918. The limitation imposed by the statute should be applied in determining the correct deficiency for the year 1919.

> *Judgment will be entered on 15 days' notice, under Rule 50.*